IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAYMZ HERNANDEZ, by his parents and next friends CRYSTELLE HERNANDEZ and JOSHUA HERNANDEZ; CRYSTELLE HERNANDEZ; and JOSHUA HERNANDEZ, <br><br> Plaintiffs, <br><br> v. <br><br> LAKESHA FOSTER, DCFS investigator, in her individual capacity; PAMELA FOSTER-STITH, DCFS supervisor, in her individual capacity; and MICHAEL RUPPE, DCFS manager, in his individual capacity, <br><br> Defendants. | Civil Action No.: 09 C 2461 <br><br> Suzanne B. Conlon, Judge |

## MEMORANDUM OPINION AND ORDER

Jaymz Hernandez and his parents, Crystelle and Joshua Hernandez[1] (collectively "plaintiffs"), bring this civil rights complaint under 42 U.S.C. § 1983 against Lakesha Foster, Pamela Foster-Stith, and Michael Ruppe (collectively "defendants"). Defendants are employees of the Illinois Department of Children and Family Services ("DCFS"). The complaint, stemming from a child abuse investigation, alleges defendants unlawfully seized Jaymz in violation of his rights under the Fourth and Fourteenth Amendments (Count I). Plaintiffs also allege violations of their substantive due process right to familial association (Count II) and their procedural due

---

[1] For ease of identification, the court uses plaintiffs' first names when referring to them individually.

process rights (Count III). Defendants move for summary judgment on all counts. For the reasons stated below, defendants' motion is granted.

I. **Background**

The following facts are derived from the parties' Local Rule 56.1 statements and exhibits.[2]

### A. *Events of September 8, 2008*

Crystelle and Joshua brought their 15 month old son, Jaymz, to Sherman Medical Center where he was treated for a torus fracture in his right arm. Def. Facts ¶ 1; Pl. Facts ¶ 1-2. A torus fracture, also known as a buckle fracture, is a common injury in children that may be caused by short falls. Pl. Facts ¶ 2. After tending to Jaymz, nurse Lisa Luebke contacted the DCFS hotline to report Jaymz' injury as possible child abuse. Def. Facts ¶ 7. Luebke advised the hotline that the parents' explanation for Jaymz' injury – that he fell out of his crib – was inconsistent with their statements that Jaymz was not yet walking or climbing and that the crib railing was up and locked. Pl. Facts ¶ 3; Def. Ex. A at D000002. Luebke also reported that Jaymz had an old, unexplained bruise above his left eyelid. Def. Ex. A at D000002. The hotline transmitted the report as an "action needed" case, meaning DCFS must take immediate steps to locate the child. Def. Facts ¶ 10.

Within thirty minutes, Pamela Foster-Stith, a DCFS supervisor, spoke on the phone with Luebke and Dr. Natalie Kostinsky, Jaymz' treating physician. Def. Facts ¶¶ 7, 12, 14. Luebke

---

[2] Plaintiffs argue several of defendants' statements should be stricken as vague, conclusory, inaccurate, or lacking in foundation. Pl. Resp. ¶¶ 61-62, 70. It is unnecessary to discuss these statements individually. The court considers the parties' submissions only to the extent they comply with Local Rule 56.1's requirements.

2

reiterated her earlier statements to the hotline: namely, that Jaymz suffered fractures to the radius and ulna on his right arm, that the parents' explanation did not match the injury, and that Jaymz had bruising above his left eye. *Id.* at ¶ 12. Dr. Kostinsky echoed Luebke's statements and further added that the bruising over Jaymz' eye predated the fractures. *Id.* at ¶ 14. Dr. Kostinsky told Foster-Stith that the parents stated there was nothing that Jaymz could have stepped on to boost himself out of the crib. *Id.* This, along with Jaymz' age, small size, and reported inability to walk or climb, aroused Dr. Kostinsky's suspicions. *Id.* Dr. Kostinsky also expressed concern about inconsistencies in the parents' statements regarding who was home at the time of the injury. *Id.*

Following these conversations, Foster-Stith directed DCFS investigator Lakesha Foster to see Jaymz at the Hernandez residence. Def. Facts ¶¶ 2, 16. That afternoon, Foster visited the Hernandez home and spoke with Crystelle. *Id.* at ¶¶ 20, 22. Crystelle stated that Jaymz was in his crib while the other household members were on a different floor of the house. *Id.* at ¶ 22. She heard Jaymz crying and found him in front of his crib, his right arm apparently injured. *Id.* Crystelle said the family had recently moved to Illinois from Texas and that Joshua, Jaymz' father, had some involvement with DCFS when he was younger – the nature of which is unknown to the court. *Id.* Foster observed Jaymz walking and playing. Def. Facts ¶ 21; Pl. Facts ¶ 7. She noticed nothing unusual during a visual inspection of the house. Pl. Facts ¶¶ 8-9.

While at the Hernandez house, Foster spoke twice on the phone with Foster-Stith; Foster-Stith, in turn, spoke with Michael Ruppe, a DCFS assistant regional administrator. Def. Facts ¶¶ 4, 24, 29, 31-32. The precise content of these conversations is disputed, as defendants' recollections are uncertain. The parties do not dispute that Ruppe and Foster-Stith decided to

3

take protective custody of Jaymz. Def. Facts ¶ 31. Foster-Stith called Foster and advised her to take temporary protective custody and to find out if there were other family members Jaymz could stay with. *Id.* at ¶ 32. Foster explained to Crystelle that Jaymz was being taken into protective custody and that she and Joshua were not to have unsupervised contact with him. Pl. Facts ¶ 10. Foster and Crystelle determined that Jaymz could stay with his maternal great-grandparents. Def. Facts ¶¶ 34-35. Jaymz was taken into protective custody at approximately 6:00 p.m. and driven to his great-grandparents' home. Def. Facts ¶ 36; Pl. Resp. ¶ 36.

### B. Events of September 9, 2008

Crystelle and Joshua accompanied Jaymz and his great-grandmother to an orthopedist who placed Jaymz' arm in a cast. Def. Facts ¶ 38. That same morning, Foster spoke again with Luebke, who maintained she had specifically asked Crystelle whether Jaymz was walking or climbing, and Crystelle responded that he was not. Def. Facts ¶ 39. After giving Dr. Kostinsky the same answer, Crystelle later said Jaymz was walking but not climbing. *Id.* Luebke reiterated to Foster that Crystelle's explanation was inconsistent with Jaymz' injury. *Id.* Foster also spoke with the orthopedist, who explained that Jaymz' injury did not appear to be the result of abuse or neglect, but was consistent with the history of a child falling from a crib. Pl. Facts ¶ 11; Def. Ex. A at D000076. In accordance with her supervisor's instructions, Foster arranged for Jaymz to undergo a full skeletal x-ray at Advocate General Hospital. Def. Facts ¶ 42; Pl. Facts ¶ 12-13. Following a physical examination and skeletal x-ray, Dr. Marcy Zirlin, an emergency medicine physician, determined the results were normal and there were no clinical or radiographic signs of abuse. Pl. Facts ¶¶ 15-16.

Foster contacted the Multidisciplinary Pediatric Education and Evaluation Consortium ("MPEEC") in order to resolve the conflicting medical opinions. Def. Ex. A at D000163. She also unsuccessfully attempted to contact the Texas Department of Human Services to determine if Crystelle or Joshua had prior involvement with child welfare authorities. Def. Facts ¶ 45. Early that afternoon, Foster-Stith reported to Ruppe that the McHenry County State's Attorney's Office determined there was insufficient evidence to file a court petition for adjudication of wardship. Def. Facts ¶ 46. She updated Ruppe on DCFS' investigative efforts, including the skeletal x-ray and MPEEC referral. *Id.* In a separate conversation, Assistant State's Attorney Julia Almeida told Foster the evidence did not warrant petitioning the court, but she agreed the investigation should be continued. Def. Facts ¶ 48; Pl. Facts ¶¶ 17-18. A determination there is insufficient evidence to file a petition is not a final one, and may be reconsidered at any time. Def. Facts ¶ 49. Foster contacted Crystelle by phone later in the afternoon and advised her that the State's Attorney was not going to file a petition. Def. Facts ¶ 50; Pl. Resp. ¶ 50. Crystelle asked if Jaymz could return to the Hernandez home, but Foster stated that he could not, at least not yet. Def. Facts ¶ 50; Pl. Resp. ¶ 50; Pl. Facts ¶ 20.

C.  *Events of September 10, 2008*

At approximately 8:40 a.m., Foster-Stith discussed the status of the investigation with Ruppe, and they decided to let Jaymz' protective custody lapse. Def. Facts ¶ 52; Def. Ex. C: Dep. Tr. at 81-84. They also discussed the implementation of a safety plan. Jaymz would continue to reside with his great-grandparents and his parents would continue to be permitted supervised contact with him. Def. Ex. A at D000082. The safety plan would remain in effect

5

while several investigative tasks were completed, and would be monitored every five days until those tasks were done. *Id.*

At 10:00 a.m., Foster met with Crystelle and Joshua at their home, and obtained their consent to the safety plan. Def. Facts ¶¶ 58-59. The safety plan, signed by both parents, provided that Jaymz would continue to stay with his great-grandparents and that the great-grandparents would supervise Jaymz' contact with Crystelle and Joshua. Def. Ex. A at D000109-10. The plan specified the conditions under which it would terminate; namely, negative results from Jaymz' medical exams (presumably the MPEEC opinion) and criminal history/child welfare background checks on Crystelle and Joshua. *Id.* The safety plan estimated DCFS would complete its investigative task within 48 hours. *Id.* Just above the parents' signature, the safety plan stated as follows:

> [W]e have discussed the safety plan with the investigator/worker, we understand its contents and that it is voluntary, and agree to abide by the terms and conditions of the plan. . . . We understand that failure to agree to the plan or to carry out the plan may result in a reassessment of my home and possible protective custody and/or referral to the State's Attorney's Office for a court order to remove my children from my home. I will then have the opportunity to plead my case in court.

Def. Ex. A at D000110. Regardless, Crystelle and Joshua aver their participation was not voluntary. Pl. Resp. ¶ 59. After signing the safety plan, Crystelle immediately went to see Jaymz and she stayed at the great-grandparent's home for the plan's duration. Def. Facts ¶ 60.

D. *Termination of Safety Plan and DCFS Investigation*

On September 11, 2008, Foster obtained Jaymz' medical records from the orthopedist's office and Advocate Good Shepherd Hospital. Def. Facts ¶¶ 61, 63. That afternoon, Foster spoke with Dr. Rosado, a physician affiliated with MPEEC. Def. Facts ¶ 62. Dr. Rosado noted

6

that torso fractures are rare in child abuse cases, but that it does happen. Def. Ex. A at D000089. She suggested Jaymz undergo a CT scan at Cook County Hospital for a more definitive diagnosis. *Id.* Although Foster spoke with Crystelle and her grandmother about the possibility of a CT scan, the test was never performed. Def. Facts ¶ 64; Pl. Resp. ¶ 64; Def. Ex. A at D000091-92.

On September 16, 2008, Crystelle consulted an attorney. Pl. Facts ¶ 22. The next day, the attorney called DCFS on her behalf and "raised hell." *Id.* at ¶¶ 23-24. Foster told Foster-Stith that the Hernandezes were resistant to the safety plan and had hired an attorney. Def. ¶ 65; Pl. Resp. ¶ 65. Discussions between Foster, Foster-Stith, and Joseph Becerra, Foster-Stith's immediate supervisor, led to a decision that the safety plan could be terminated. Def. Facts ¶ 66; Pl. Resp. ¶ 66. On the evening of September 18, 2008, Joshua signed the termination agreement. Def. Facts ¶ 67-68; Def. Ex. A at D000113. DCFS' investigation continued, but was concluded as unfounded on November 7, 2008. Def. Facts ¶¶ 69, 72. "Unfounded" means DCFS found no credible evidence of abuse or neglect. *Id.* at ¶ 71.

## II. Summary Judgment Standard

Summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant has the initial burden of demonstrating that it is entitled to summary judgment. *Kramer v. Vill. of N. Fond du Lac*, 384 F.3d 856, 861 (7th Cir. 2004). Once the movant has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e)(2);

*Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the nonmoving party. *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 771 (7th Cir. 2002). A genuine issue of material fact exists when the evidence is sufficient to support a reasonable jury verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III. Discussion

Defendants move for summary judgment on the grounds they are entitled to qualified immunity for their participation in the events described above. Qualified immunity protects government officials performing discretionary functions from civil damages liability unless their conduct violates clearly established statutory or constitutional rights. *Pearson v. Callahan*, 129 S.Ct. 808, 815 (2009); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The protection applies regardless of whether the official's error was a mistake of law, a mistake of fact, or a mistake on mixed questions of law or fact. *Pearson*, 129 S.Ct. at 815. Before liability can attach, the contours of the right in question must be sufficiently clear that a reasonable official would understand her conduct violates that right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Courts previously analyzed qualified immunity defenses by first determining whether there had been a constitutional violation and then determining whether the right at issue was clearly established. *Jacobs v. City of Chicago*, 215 F.3d 758, 766 (7th Cir. 2000). In 2009, the Supreme Court reconsidered the two-step procedure for resolving qualified immunity claims and held that courts are not required to first determine whether plaintiffs have shown the violation of a constitutional right. *Pearson*, 129 S.Ct. at 818-821 (rigid adherence to two-step protocol departs from general rule of constitutional avoidance). The court may exercise its discretion in

deciding which of the two prongs should be addressed first in light of the circumstances. *Id.* at 818.

Plaintiffs bear the burden of demonstrating that the constitutional right was clearly established. *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009). Determining whether the law was clearly established requires a comparison of the specific facts of the case with the body of law that existed at the time of the alleged conduct. *Jacobs*, 215 F.3d at 765. If the right was not clearly established, the official is immune from suit and the claim must be dismissed. *Id.* at 766. Plaintiffs may meet their burden by showing there is a clearly analogous case establishing a right to be free from the specific conduct at issue or that the conduct was so egregious that no reasonable person could have believed it would not violate clearly established rights. *Gonzalez*, 578 F.3d at 540.

### A. Fourth Amendment Claim

Jaymz alleges defendants violated his right to be free from an unreasonable seizure when they removed him from his parents' care and custody without a warrant or reasonable suspicion that he had been abused or neglected by his parents. A person is "seized" when, in view of all surrounding circumstances, a reasonable person would not have felt free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). The Fourth Amendment's protection extends beyond criminal arrests to include warrantless intrusions by the government during civil investigations, including intrusions by child welfare workers. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978); *Wooley v. City of Baton Rouge*, 211 F.3d 913, 925 (5th Cir. 2000); *Tenenbaum v. Williams*, 193 F.3d 581, 606 (2d Cir. 1999). Jaymz, a 15 month old child, was removed from the sole care and custody of his parents at the direction of DCFS. Though Jaymz was too young to

9

form a personal belief as to whether he was free to leave, Foster told Crystelle that Jaymz was being placed into protective custody and removed from the Hernandez home. Foster then drove Jaymz to his great-grandmother's house. This is sufficient to constitute a Fourth Amendment seizure. *Brokaw v. Mercer County*, 235 F.3d 1000, 1010 (7th Cir. 2000) (small child physically carried away from family by government officials is "seized"); *Kia P. v. McIntyre*, 235 F.3d 749, 762 (2d Cir. 2000) (baby "seized" when kept from parents' custody).

Merely showing a seizure occurred is not enough to establish a constitutional violation; the seizure must be unreasonable. *See Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (touchstone of the Fourth Amendment is reasonableness). The court must consider Jaymz' seizure in light of the specific circumstances, namely the removal of a child from his home based on an allegation of abuse. This type of seizure is reasonable if it is pursuant to a court order, supported by probable cause, or justified by exigent circumstances, meaning that government officials have reason to believe that life or limb is in immediate jeopardy. *Brokaw*, 235 F.3d at 1010. Jaymz was not taken into protective custody pursuant to a court order, and defendants do not argue his removal was justified by exigent circumstances. The sole issue is probable cause. Because defendants invoke qualified immunity, the court need not determine whether there was, in fact, probable cause to seize Jaymz without a court order, but rather whether defendants were reasonable in their belief that probable cause existed to support a seizure. *Hunter v. Bryant*, 502 U.S. 224, 228-29 (1991).

At the time of Jaymz' removal, defendants knew the following: a 15 month old child suffered fractures to his right forearm; the attending physician and nurse believed the parents' explanation was inconsistent with the injury; the child had an unexplained, preexisting bruise

over his left eyelid; and there were inconsistencies in the parents' statements regarding who was home at the time of the injury and whether the child was able to walk or climb. Although Foster did not discover other evidence of abuse during her inspection of the Hernandez residence, defendants were not unreasonable in relying on information provided by independent, mandated reporters in reaching the determination that temporary protective custody was justified. At the very least, child welfare workers of reasonable competence could disagree on the reasonableness, and therefore the legality, of defendants' actions.

Furthermore, plaintiffs fail to demonstrate that the seizure violated a clearly established constitutional right. Although plaintiffs bear the burden of demonstrating the right was clearly established, they eschew this task by merely pointing to the court's previous order denying defendants' motion to dismiss on qualified immunity grounds. Pl. Mem. at 7-8. The court noted that *Doe v. Heck*, 327 F.3d 492 (7th Cir. 2003), and *Michael C. v. Gresbach*, 526 F.3d 1008 (7th Cir. 2008), established a general principle that "a reasonable child welfare worker would know that it is a violation of a child's constitutional rights to seize or search the child, on private property, without a warrant, consent, probable cause, or exigent circumstances." July 6, 2009 Mem. Op. and Order at 12, Dkt. 36. But the court declined to grant qualified immunity at the pleading stage because there were insufficient facts upon which to evaluate defendants' conduct. The factual record has been developed, but plaintiffs make only a conclusory argument that *Heck* and *Gresbach* were sufficient to put defendants on fair notice that their conduct was unconstitutional. While the general principle described is well-established, courts do not resolve issues of qualified immunity at a high level of generality. *Anderson*, 483 U.S. at 639-40. The constitutional right defendants allegedly violated (Jaymz' right against unreasonable seizure)

must have been established in a more particularized sense – its contours must be sufficiently clear that a reasonable official would understand their conduct violates that right. *Anderson*, 483 U.S. at 640. Plaintiffs need not point to a case with identical facts, but the unlawfulness of defendants' actions must be apparent in light of pre-existing law. *Id.*; *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000).

Neither *Heck* nor *Gresbach* establish that a reasonable child welfare worker would understand that protective custody under these circumstances would amount to an unconstitutional seizure. In *Heck*, child welfare workers had *no evidence* the parents were abusing their children or were complicit in any abuse before the workers subjected the children to custodial interrogation without parental consent and threatened to remove the children from the parents' custody. 327 F.3d at 524. *Gresbach* dealt with a social worker who performed an invasive search of children at a private school without parental consent. 526 F.3d at 1010. The facts here are fundamentally different from *Heck* and *Gresbach*. The court cannot conclude a reasonable DCFS official would have realized that taking Jaymz into protective custody would violate his Fourth Amendment right. Although DCFS' investigation was ultimately concluded as unfounded, there was *some* evidence of abuse at the time Jaymz was seized; specifically, the information provided to DCFS by nurse Luebke and Dr. Kostinsky. Plaintiffs fail to identify an analogous case that would have provided defendants with fair notice that Jaymz' temporary removal from his parents' custody under these circumstances was unconstitutional. Plaintiffs do not contend that defendants' conduct with respect to Jaymz' removal was so egregious that no reasonable official could have believed it would not violate clearly established rights.

Accordingly, defendants are entitled to qualified immunity as to Jaymz' Fourth Amendment claim.

## B. Substantive Due Process Claim

Plaintiffs allege defendants violated their substantive due process right to familial relations by taking Jaymz into protective custody without sufficient evidence of abuse, conditioning parental contact with Jaymz upon acceptance of restrictions in their right to live together, and falsely representing the facts and legal basis upon which the conditions were imposed. Parents have a fundamental liberty interest in custody of their children, and children enjoy the corresponding right to be cared for by their parents. *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Brokaw*, 235 F.3d at 1018-19. The right to familial integrity, however, is not absolute. *Brokaw*, 235 F.3d at 1019. It is limited by a compelling government interest in the protection of children, particularly where children need to be protected from their own parents. *Id.*; *Croft v. Westmoreland County Children & Youth Servs.*, 103 F.3d 1123, 1125 (3d Cir. 1997).

Given defendants' reliance on the qualified immunity defense, plaintiffs must show, on some level, that a violation of substantive due process right has been found in a factually similar case, or that the violation was so clear that an official would have known his actions violated these rights even in the absence of a similar case. *Lee v. Young*, 533 F.3d 505, 512 (7th Cir. 2008). In appropriate cases, the court need not determine whether the alleged conduct violated a constitutional right before finding qualified immunity. *Pearson*, 129 S.Ct. at 818. Because the substantive due process inquiry is so fact-dependent, the court first considers whether the rights in question are clearly established. *Id.* at 819.

13

To the extent plaintiffs' substantive due process claim is premised on Jaymz' initial removal, the Fourth Amendment addresses that seizure (as discussed above), and thus it should not be considered under the rubric of substantive due process. *Brokaw*, 235 F.3d at 1017-18 (citing *United States v. Lanier*, 520 U.S. 259, 272 n. 7 (1997)). With respect to the conditions imposed on plaintiffs during the interval between Jaymz' seizure and implementation of the safety agreement, plaintiffs do not identify any case law showing a clearly established substantive due process right. Once Jaymz was taken into temporary protective custody, Illinois law specified that he be brought before a judicial officer within 48 hours or released. 705 ILCS 405/2-9. During the period of protective custody, defendants insisted that Jaymz reside outside the Hernandez home (with the great-grandparents) and that Crystelle and Joshua's contact with him be supervised. Defendants had no interest in protecting Jaymz from his parents unless they possessed definite and articulable evidence giving rise to a reasonable suspicion of abuse. *Brokaw*, 235 F.3d at 1019. The evidence consisted of Jaymz' injury and the hospital staff's concerns over inconsistencies in the parents' statements. While those suspicions were later found to be unsupported, the court cannot conclude a reasonable child welfare worker would have understood the conditions imposed were unlawful.

The rest of plaintiffs' substantive due process claim involves the circumstances under which plaintiffs agreed to the safety plan. The safety plan had the effect of maintaining the status quo: Jaymz continued to reside with his great-grandparents and Crystelle and Joshua were permitted to have contact with Jaymz, albeit supervised. But plaintiffs contend defendants threatened and lied to them in order to obtain the consent to the safety plan. The record does not support the allegations. According to Crystelle, Foster said "this was the safety plan, and that

once we sign it we can go and see Jaymz. But we couldn't be alone with him or take him anywhere, but we can go stay at my grammy's house if we wanted to, can't be unsupervised. My grammy still has the custody over him; that I don't have like my parental rights . . . . If we didn't sign it we couldn't see him." Pl. Ex. 6: Dep. Tr. at 193. When asked if he understood the terms of the safety plan, Joshua testified, "We didn't have legal custody. . . . the safety plan allowed us to see our son, but we could only be with him as long as we were still within the presence of [Crystelle's] grandparents." Pl. Ex. 12: Dep. Tr. at 154. There is no dispute that the safety plan contained express language indicating its voluntary nature and the risks of non-compliance. Considered in context, Foster's statements cannot reasonably be construed as threats or coercion. *See Shank v. William R. Hague, Inc.*, 192 F.3d 675, 683 (7th Cir. 1999) (courts not required to draw every conceivable inference in nonmovant's favor – only reasonable ones).

In any event, plaintiffs fail to show their substantive due process rights were clearly established in this context. Plaintiffs rely on *Dupuy v. Samuels*, 465 F.3d 757 (7th Cir. 2006), which upheld the legitimacy of DCFS safety plans offered to parents *in lieu of* removing the child from the parents' custody. 465 F.3d at 761-63. *Dupuy* rests on the premise that DCFS' threat of removal was grounded in proper legal authority, and therefore the parents' consent was not coerced. *Id.* at 762. The issue here is somewhat different. The safety plan served to extend the conditions of a temporary protective custody. But plaintiffs believe the principles set forth in *Dupuy* were sufficient to apprise defendants that their conduct was unlawful. Specifically, plaintiffs rely on *Dupuy*'s recognition that consent garnered through duress, extortion, or other wrongful means would be involuntary if not grounded in proper legal authority. *Id.* at 762-63.

15

*Dupuy* does not set out a roadmap of constitutionally violative conduct against which defendants could have measured their own actions. *Landstrom v. Ill. Dept. of Children & Family Servs.*, 892 F.2d 670, 677 (7th Cir. 1990). Nothing in *Dupuy* would lead a reasonable official to believe the manner in which the safety plan was agreed upon violated a clearly established constitutional right. Jaymz was taken into protective custody at 6:00 p.m. on September 8, 2008. Defendants were required under Illinois law to bring Jaymz before a judicial officer within 48 hours or release him from custody. 705 ILCS 405/2-9. When plaintiffs were presented with the safety plan on the morning of September 10, the 48-hour window had not yet closed. Although the State's Attorney's Office declined to file a petition with the court on September 9, there is no dispute that decisions of this type are open to reconsideration. Defendants may have decided to let protective custody lapse, but they were not without legal authority on the morning of September 10 to pursue a court hearing if they so chose. Even if the court construes Foster's statements to Crystelle and Joshua as coercion, coercion is not forbidden when DCFS is merely threatening to enforce its legal rights. *Dupuy*, 465 F.3d at 762.

Plaintiffs also fail to demonstrate that the terms of the safety plan fall within the scope of a clearly established right. The terms were not arbitrary or unreasonable. Prior to the safety plan's implementation, defendants received some medical opinions suggesting Jaymz' injury was not caused by abuse or neglect. But the safety plan struck a reasonable balance in ensuring Jaymz' safety until defendants could complete their investigation. The extent of plaintiffs' right to family integrity and association was not so well-developed as to place defendants on notice that their actions were unlawful. Given the nebulous balance between the liberty interest in familial relations and the state's interest in protecting children, "social workers and other state

16

actors who cause a child's removal are entitled to qualified immunity because the alleged constitutional violation will rarely – if ever – be clearly established." *Brokaw*, 235 F.3d at 1023. Defendants are entitled to qualified immunity.

C.  *Procedural Due Process Claim*

Plaintiffs' procedural due process claim alleges defendants: (1) took custody of Jaymz in the absence of an emergency or a court order, though there was sufficient time to seek one; (2) demanded they accept restrictions on their right to reside together; (3) failed to inform them of any procedure for challenging restrictions; and (4) failed to provide accurate information regarding the investigation, their legal rights, and available legal remedies. In procedural due process claims, deprivation of a protected interest is not necessarily itself unconstitutional; what is unconstitutional is deprivation of a protected interest without due process of law. *Doe by Nelson v. Milwaukee County*, 903 F.2d 499, 502 (7th Cir. 1990) (citation omitted). Due process is a flexible concept that varies as the particular situation demands. *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976).

In this context, due process generally means government officials will not remove a child from his home without an investigation and pre-deprivation hearing, absent exigent circumstances. *Brokaw*, 235 F.3d at 1020; *Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir. 1983) ("when a child's safety is threatened, that is justification enough for action first and hearing afterward"). The issue here is whether defendants violated a clearly established right by taking Jaymz into protective custody without attempting to secure a court order. Although *Brokaw*'s general principle stated may be well-established, plaintiffs do not present the court with an analogous case that provided defendants with fair notice that their action was

17

unconstitutional. *See Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 620 (7th Cir. 2002) (case law should articulate the right at issue and apply it to a similar factual circumstance). Defendants had reasonable suspicion that a 15 month old child had been abused, based on reports provided by Luebke and Dr. Kostinsky. In light of this suspicion, defendants sought to place Jaymz with other family members and to limit the parents to supervised contact while the investigation continued. A reasonable child welfare worker could believe that this limited intrusion into the parents' custody did not require an immediate court hearing. Plaintiffs do not present any case suggesting this belief is unreasonable.

Furthermore, plaintiffs fail to demonstrate that any alleged due process violations surrounding the implementation of the safety plan violated clearly established rights. The record does not support plaintiffs' contention that defendants misrepresented the facts in obtaining plaintiffs' consent to the safety plan. The plan itself expressly informed plaintiffs of the procedures available to them should they elect not to participate. To the extent that defendants could have provided plaintiffs with more options or more information, defendants' obligations are not so well-developed as to place them on notice that their actions were unconstitutional. The court is unpersuaded by plaintiffs' argument that defendants' conduct was so outrageous as to make its unlawfulness apparent. This was obviously a painful episode for the Hernandez family. But in light of the compelling government interest in the protection of children, the conditions imposed by defendants were minimally intrusive. During temporary protective custody and throughout the duration of the safety plan, Jaymz was placed in the care of his great-grandparents. No defendant prevented Crystelle and Joshua from maintaining contact with their son; the only restriction was that another family member be present as well. Plaintiffs complain

about the absence of a court hearing, but they did not request one. While plaintiffs insist defendants were obligated to inform them of this right, they do not cite any case law establishing the extent of this obligation. Accordingly, defendants are entitled to qualified immunity.

## CONCLUSION

Defendants are entitled to qualified immunity. Accordingly, their motion for summary judgment is granted.

ENTER:

Suzanne B. Conlon
United States District Judge

January 15, 2010